**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

_____

**TERRIANNE E. OTTS,**

                              **Plaintiff,**

         **v.**                                        **5:04-CV-515**
                                                       **(GLS)**

**COMMISSIONER OF SOCIAL**
**SECURITY,**

                              **Defendant.**

_____

**APPEARANCES:**                        **OF COUNSEL:**

**FOR THE PLAINTIFF:**

OLINSKY, SHURTLIFF LAW FIRM          HOWARD OLINSKY, ESQ.
300 South State Street
5th Floor
Syracuse, New York 13201

**FOR THE DEFENDANT:**

HON. GLENN T. SUDDABY               WILLIAM H. PEASE
United States Attorney              Assistant U.S. Attorney
PO Box 7198
100 South Clinton Street
Syracuse, New York 13261-7198

**Gary L. Sharpe**
**U.S. District Judge**

## MEMORANDUM-DECISION AND ORDER

### I. Introduction

Terrianne Otts challenges the denial of disability benefits by the Commissioner of Social Security.  Otts brings this action pursuant to 42 U.S.C. § 405(g) seeking review of the Commissioner's final determination. Having reviewed the administrative record, the court affirms the Commissioner's decision.

### II. Procedural History

After Otts filed for Social Security Disability Insurance (SSDI) and Supplemental Security Income (SSI) benefits in July 2000, her application was denied, and a hearing was conducted by Administrative Law Judge (ALJ) Joseph Medicis, Jr.  Otts alleges disability beginning on January 31, 2000, due to a herniated disk, a bulging back disc, asthma, bone spurs, and arthritis of the lower back and knees.  (Tr. 27, 118).  On February 21, 2002, the ALJ issued a decision denying benefits, and that decision became the Commissioner's final determination.

### III. Contentions

Otts contends that the ALJ's decision is not supported by substantial evidence.  More specifically, she claims that the ALJ erroneously

2

concluded that her neck impairment was not severe.  Otts also claims that

the ALJ did not give proper weight to the opinion of her treating physician

or properly determine her Residual Functional Capacity (RFC).  She further

claims that the vocational expert based his opinion on improper findings,

since the ALJ made mistakes in his analysis.  Lastly, Otts contends that the

ALJ did not fully credit her subjective complaints of pain.  The

Commissioner counters that substantial evidence supports the ALJ's

disability determination.

## IV.  <u>Facts</u>[1]

### A.   <u>Background</u>

At the time she filed for disability benefits, Otts was 34 years old.  (Tr.

78).  She has a high school education and a two year associates degree

for secretarial work.  (Tr. 307).  In the past, the majority of Otts'

employment involved clerical work.  (Tr. 97).  Otts' most recent job was as

a secretary for Deluxe Financial, and her duties included filing and making

phone calls.  (Tr. 306).

During the administrative hearing, Otts testified that her back and

---

[1]The defendant did not include a statement of facts.  Therefore, the following facts were taken from the administrative record and Otts' statement of facts.  *See Pl. Brief, pp. 2-5; Dkt. No. 7.*

neck problems caused her to be disabled.  (Tr. 308-309).  She testified that she has her driver's license, and drives locally one to two times per week.  (Tr. 305).  She testified that her husband washes her hair but that she can take care of her own personal hygiene "somewhat."  (Tr. 315).  As for household chores, she testified that her husband does the majority of the cleaning and cooking.  *See id.*  Otts also testified that she does no physical exercise, such as walking, swimming or aerobics, but instead, spends the majority of her time watching TV.  *See id.*  Prior to her disability, she claimed that she used to ride four wheelers, horseback ride, fish and do crafts.  (Tr. 320).  She testified that her five year old daughter mainly takes care of herself.  (Tr. 316).  Otts also testified that she does not socialize, other than with relatives in the area.  *See id.*  When asked by the ALJ about her sleeping habits, she replied that she does not sleep well.  (Tr. 317).

Vocational expert, David Conroy, also testified at the hearing.  (Tr. 331-352).  Mr. Conroy testified that he believed that a person with Otts' limitations could find work as an information clerk because it does not require writing or other typical clerical work.  (Tr. 334).  He further testified that there are two types of information clerk jobs, which are distinguished

4

by the amount of standing and walking required by each. (Tr. 334). The job can also be either unskilled with a light exertional level, or semi-skilled and sedentary in nature. *See id.* Mr. Conroy also testified that jobs as a surveillance monitor were compatible with Otts' limitations. (Tr. 336). Mr. Conroy also noted that individuals with physical limitations like Otts could be accommodated by using a hands-free headset and also by using ergonomically designed work stations. (Tr. 346). According to Mr. Conroy's research, such jobs are plentiful in the area, including at department stores, businesses, and security offices. *See id.*

## B.   Medical Evidence

### 1. Prior to Onset Date

In October 1994, Otts went into the hospital because she was having problems with her asthma. (Tr. 157). In November, Dr. Henry Chinonuma noted that Otts was still having trouble wheezing, and that she was also experiencing congestion from a sinus infection. *See id.* Dr. Chinonuma prescribed both Ventolin and Asthmacort for Otts' symptoms. *See id.* In January 1995, Otts was again examined by Dr. Chinonuma for her asthma, as well as lower back pain. (Tr. 158). Dr. Chinonuma observed that Otts had a slight decrease in her range of motion, and that she experienced

pain when he touched her lower back.  *See id.*  Otts was diagnosed with restrictive airway disease, but deemed stable.  *See id.*  Dr. Chinonuma recommended that Otts enroll in a weight loss and aerobic exercise program.  *See id.*[2]

In April 1995, Otts also began seeing Dr. Peter Hixson, a hand surgeon, for wrist pain.  (Tr. 161).  Dr. Hixon concluded that Otts' history and work as a secretary suggested that her wrist pain was derived from carpal tunnel.  (Tr. 162).  However, the doctor further observed that it was possible that Otts suffered from a tear in the ligaments of her right wrist.  *See id.*  Dr. Hixon further noted that Otts also had asthma and a history of lower back problems but that both seemed well controlled by medication.  (Tr. 163).  In September 1995, Dr. Hixson diagnosed Otts with bilateral DeQuervain's disease.[3]  (Tr. 185).  In making his diagnosis, Dr. Hixson noted that he believed Otts' right wrist pain was work related, while her left

---

[2]In 1999 and 2000, Otts began allergy shots after she tested positive for: multiple trees, grass, weed pollens, dust mites, and cat dander.  (Tr. 230).

[3]DeQuervain's disease is defined as "painful tenosynovitis due to relative narrowness of the common tendon sheath of the abductor pollicis longus and the extensor pollicis brevis." DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 481 (28th ed. 1994).  In layman's terms, this can be translated as inflammation of the muscle tendons.  *See* http://www.emedicine.com/emerg/topic571.htm.

wrist pain was a symptom of her pregnancy.[4]  (Tr. 186).  He further noted

that Otts would have some relief in both wrists after her baby was born.

*See id.*  On May 23, 1996, after her pain worsened, Otts underwent surgery

on her right wrist.  (Tr. 175).  Upon Otts' last visit to Dr. Hixson, he

observed that she could still perform some duties as a typist and secretary,

but that "she should limit...repetitive motion of the hands and limit typing to

only a few hours a day, and no lifting over ten pounds."  (Tr. 197).

In September 1996, Otts was examined by Dr. Kalyani Ganesh.  (Tr.

200).  Dr. Ganesh determined that her range of motion in her cervical

spine, shoulder and elbow were normal.  (Tr. 201).  Despite normal testing,

however, he noted that Otts complained of soreness and pain in her right

wrist.  *See id.*

### 2. Post-Onset Date

Otts claims that her disability began on January 31, 2000, following a

fall down a flight of stairs that resulted in pain in her right arm and shoulder.

(Tr. 78).  She had a MRI of her cervical spine taken in April 2000.  (Tr.

242).  The findings showed what appeared to be disc herniations at the C5-

_____

[4]When Dr. Hixon examined Otts in May 1995, she was three months pregnant.  (Tr.
161).

6 and C6-7 levels of her spinal cord, and stenosis or narrowing at the C6-7 level. *See id.*

In August 2000, Otts visited Dr. Ganesh for neck pain and her asthma. (Tr. 245).  Following an examination, Dr. Ganesh noted that although Otts was morbidly obese, she was not in acute distress, and that all range of motion tests were normal, with the exception of some limitation to her right shoulder due to pain. (Tr. 245-247).  Dr. Ganesh also noted that Otts' hand and finger dexterity were intact, and that she maintained good grip strength and motor skills. (Tr. 247).  Overall, he diagnosed Otts with a herniated neck disk, a bulging back disk, post-surgery status for her DeQuervain's condition in her right wrist, asthma and morbid obesity. *See id.*  Dr. Ganesh concluded that Otts does not appear to have any "gross physical limitations [sic] to sitting or standing. [Otts] appears to have mild to moderate limitations to lifting, carrying, pushing, and pulling." *See id.*

On February 5, 2001, Otts visited Dr. Zogby, an orthopedic surgeon, for a spinal consultation. (Tr. 263).  Dr. Zogby observed that Otts held her right arm stiff against her chest when visiting his office. (Tr. 264).  He further observed that her spinal cord was normal, except for the cervical spine which revealed muscle tenderness. *See id.*  Dr. Zogby stated: "she

8

has limited range of motion with 20 degrees of extension and 20 degrees rotation, right [sic] with increased right arm and shoulder pain."  *Id.*  He also noted that her left side was less restricted than her right.  *See id.*  In conclusion, Dr. Zogby opined that the only option for relief would be surgery, but Otts expressed no interest.  (Tr. 265).  Thus, he found her totally disabled from work.  *See id.*

In May 2001, Dr. David Barber[5] opined that "[Otts] is disabled from any kind of work that would require use of the right arm in any way."  (Tr. 262).  He further opined "[her former work as a secretary] would require use of [her right] arm for phones, filing, typing or writing, and that would be difficult, if not impossible, at this point."  *See id.*  Dr. Barber concluded that "[he] would consider her disabled from gainful employment."  *See id.*

In July 2001, Dr. Barber also filled out a "Medical Source Statement of Ability to Do Work-Related Activities."  (Tr. 271-74).  Dr. Barber opined that she could lift less than 10 pounds occasionally, and less than 10 pounds frequently, but had no limitations standing, sitting, or walking.  (Tr. 271).  However, he opined that she had restrictions pulling and pushing with her right arm due to shoulder and neck pain.  (Tr. 272).  In regards to

---

[5]Otts began seeing Dr. David Barber in January 2000.

her postural limitations, he found that her herniated neck disks and pinched nerves would be worsened by stooping.  *See id.*  Dr. Barber also found that Otts was limited in fine manipulations with her hands.  (Tr. 273).  He also noted that her asthma caused environmental limitations.  (Tr. 274).  Lastly, in a short memo written in October 2001, Dr. Barber stated that due to her neck and shoulder pain, Otts would "likely not be able to write for prolonged periods."  (Tr. 275).

## V. <u>Discussion</u>

### A.   <u>Standard and Scope of Review</u>

A court's review of the Commissioner's final decision is limited to determining whether the correct legal standards were applied and whether substantial evidence supports the decision.  *See Urtz v. Callahan*, 965 F. Supp. 324, 326 (N.D.N.Y. 1997) (citing *Johnson v. Bowen*, 817 F.2d 983, 985 (2d Cir. 1987)).  Although the Commissioner is ultimately responsible for determining a claimant's eligibility, the actual disability determination is made by an ALJ.  The ALJ's decision is subject to judicial review on appeal.  *See* 42 U.S.C. § 405(g).  A court may not affirm an ALJ's decision if it reasonably doubts whether the proper legal standards were applied, even if it appears to be supported by substantial evidence.  *See Johnson*,

817 F.2d at 986.  In addition, an ALJ must set forth the crucial factors justifying his findings with sufficient specificity to allow a court to determine whether substantial evidence supports the decision.  *See Ferraris v. Heckler*, 728 F.2d 582, 587 (2d Cir. 1984).

A court's factual review of the Commissioner's "findings is limited to assessing whether substantial evidence in the record supports those findings." *Rivera v. Sullivan*, 923 F.2d 964, 967 (2d Cir. 1991); *see also* 42 U.S.C. § 405(g).  "Substantial evidence has been defined as 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion[.]'" *Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988) (citations omitted).  It must be "more than a mere scintilla" of evidence scattered throughout the administrative record.  *Id*.  "To determine on appeal whether an ALJ's findings are supported by substantial evidence, a reviewing court considers the whole record, examining the evidence from both sides, because an analysis of the substantiality of the evidence must also include that which detracts from its weight."  *Id*.  However, a reviewing court cannot substitute its interpretation of the administrative record for that of the Commissioner if the record contains substantial support for the ALJ's decision.  *See  Rutherford v. Schweiker*, 685 F.2d 60, 62 (2d Cir. 1982).

The court has authority to reverse with or without remand.  *See* 42 U.S.C. § 405(g).  Remand is appropriate where there are gaps in the record or further development of the evidence is needed.  *See Parker v. Harris*, 626 F.2d 225, 235 (2d Cir. 1980); *see also Cutler v. Weinberger*, 516 F.2d 1282, 1287 (2d Cir. 1975) (remand to permit claimant to produce further evidence).  Reversal is appropriate, however, when there is "persuasive proof of disability" in the record and "remand for further evidentiary proceedings would serve no purpose."  *Parker*, 626 F.2d at 235; *see also Simmons v. U.S. R.R. Ret. Bd.*, 982 F.2d 49, 57 (2d Cir. 1992); *Carroll v. Sec'y of HHS*, 705 F.2d 638, 644 (2d Cir. 1983) (reversal without remand for additional evidence particularly appropriate where remand would result in lengthening the "painfully slow process" of determining disability).

**B.    Five-Step Disability Determination**

The definition of "disabled" is the same for purposes of receiving SSDI and SSI benefits.  To be considered disabled, a plaintiff seeking benefits must establish an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or

can be expected to last for a continuous period of not less than twelve

months[.]" 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).[6]  The Commissioner

uses a five-step process to evaluate SSDI and SSI claims.  *See* 20 C.F.R.

§§ 404.1520(a)(4), 416.920(a)(4).[7]  Step One requires the ALJ to

determine whether the claimant is presently engaging in substantial gainful

activity (SGA).  *See* 20 C.F.R. §§ 404.1520(a)(4)(I), 416.920(a)(4)(I).  If a

claimant is engaged in SGA, she will not be considered disabled.  If the

claimant is not engaged in SGA, Step Two requires the ALJ to determine

whether the claimant has a severe impairment.  *See* 20 C.F.R. §§

404.1520(a)(4)(ii), 416.920(a)(4)(ii).  If the claimant is found to suffer from a

---

[6]In addition, a claimant's

> physical or mental impairment or impairments [must be] of such
> severity that [s]he is not only unable to do her previous work but
> cannot, considering [her] age, education, and work experience, engage
> in any other kind of substantial gainful work which exists in the
> national economy, regardless of whether such work exists in the
> immediate area in which [s]he lives, or whether a specific job vacancy
> exists for [her], or whether [s]he would be hired if [s]he applied for work.

42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).  Therefore, a plaintiff must not only carry a
medically determinable impairment but an impairment so severe as to prevent her from
engaging in any kind of substantial gainful work which exists in the national economy.

[7]The court notes that revised versions of these sections became effective in September
2003.  *See* 68 Fed. Reg. 51161, 51164 (Aug. 26, 2003).  In the revised versions, paragraph (e)
clarifies the application of the RFC determination.  New paragraphs (f) and (g), with certain
modifications, correspond to the prior versions' paragraphs (e) and (f), respectively.  These
revisions do not affect the Five-Step Disability Determination sequence.  The revised versions
have no effect on the outcome of this case.  For considerations of uniformity, and because the
ALJ's decision predated the revisions, the court retains the old nomenclature in its analysis.

severe impairment, Step Three requires the ALJ to determine whether the claimant's impairment meets or equals an impairment listed in 20 C.F.R. 404, Subpart P, Appendix 1. *See* 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii). If the impairment meets or equals a listed impairment, the claimant is presumptively disabled. *See Ferraris*, 728 F.2d at 584. If the claimant is not presumptively disabled, Step Four requires the ALJ to consider whether the claimant's Residual Functional Capacity (RFC) precludes the performance of her past relevant work. *See* 20 C.F.R. §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv). At Step Five, the ALJ determines whether the claimant can do any other work. *See* 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v).

The claimant has the burden of showing that she cannot perform past relevant work. *See Ferraris*, 728 F.2d at 584. However, once the claimant meets that burden, benefits can only be denied by showing, with specific reference to medical evidence, that the claimant can perform some less demanding work. *See White v. Sec'y of HHS*, 910 F.2d 64, 65 (2d Cir. 1990); *Ferraris*, 728 F.2d at 584. In making this showing, the ALJ must consider the claimant's RFC, age, education, past work experience, and transferability of skills, to determine if the claimant can perform other work

existing in the national economy.  *See* 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v); *see also N.Y. v. Sullivan*, 906 F.2d 910, 913 (2d Cir. 1990).

In this case, the ALJ found that Otts satisfied Step One because she had not worked since January 31, 2000.  (Tr. 27).  In Step Two, the ALJ determined that Otts had "severe" impairments due to "cervical disc herniation, radiculopathy into the back and right shoulder, and status post DeQuervain's disease."  (Tr. 33).  In Step Three, the ALJ determined that her impairments failed to equal an impairment or combination of impairments listed in, or medically equal to, one listed in the regulations. (Tr. 34).  In Step Four, the ALJ determined that Otts retained the RFC to perform light exertional work, which included her past relevant clerical work.  *See id.*  At Step Five, the ALJ determined that Otts was also capable of doing other work that exists in the national economy.  *See id.* For example, he determined that she could perform work as an information clerk or surveillance monitor.  *See id.*  Consequently, he found that Otts was not disabled and denied benefits.  *See id.*

## C.   Severity of Neck Impairment

Otts argues that the ALJ erroneously determined that her neck

impairment was non-severe.  She specifically contends that her neck

impairment directs a finding of disability under "the listings."  *See* 20 C.F.R.

404, Subpt. P, App. 1.

The definition of a severe impairment is one that "significantly limits

[the claimant's] physical or mental ability to do basic work activities[.]"  20

C.F.R. §§ 404.1520(c), 416.920(c).  "Basic work activities" include

"[p]hysical functions such as walking, standing, sitting, lifting, pushing,

pulling, reaching, carrying, or handling[.]"  20 C.F.R. § 404.1521(b)(1),

416.921(b)(1).  Basic work activities also include "[c]apacities for seeing,

hearing, and speaking;...[u]nderstanding, carrying out, and remembering

simple instructions;...[u]se of judgment;..." and other mental functions

required for work.  20 C.F.R. §§ 404.1521(b)(2)-(6), 416.921(b)(2)-(6).

Moreover, the listings applicable here provide:

> 1.04 Disorders of the spine (e.g., herniated nucleus pulposus,
> spinal arachnoiditis, spinal stenosis, osteoarthritis,
> degenerative disc disease, facet arthritis, vertebral fracture),
> resulting in compromise of a nerve root (including the cauda
> equina) or the spinal cord. With:
>
> A. Evidence of nerve root compression characterized by
> neuro-anatomic distribution of pain, limitation of motion of the
> spine, motor loss (atrophy with associated muscle weakness or
> muscle weakness) accompanied by sensory or reflex loss and,
> if there is involvement of the lower back, positive straight-leg

raising test (sitting and supine)[.]...

*See* 20 C.F.R. 404, Subpt. P, App. 1, Listing 1.04.  Moreover, "[f]or a

claimant to qualify for benefits by showing that [her] unlisted impairment, or

combination of impairments, is 'equivalent' to a listed impairment, [s]he

must present medical findings equal in severity to *all* the criteria[.]..."

*Sullivan v. Zebley*, 493 U.S. 521, 531 (1990).  Here, the ALJ found that

Otts' neck impairment did not reach the level of severity set forth in the

listings.  For the reasons that follow, the court concurs with the ALJ's

findings.

In support of Otts' contention that her impairment was severe, she

cites a MRI that revealed disc herniations at C5-6 and C6-7, and spinal

cord deformity.  (Tr. 242).  Additionally, her treating physician, Dr. Barber,

noted pinched nerve roots on the right side.  (Tr. 272).  Otts contends that

these findings meet the initial requirements for spinal disorders.

However, although Otts has established that her neck impairment

meets the initial definition of a spinal disorder, she has not adduced

sufficient evidence to satisfy the remaining requirements for severity, such

as "neuro-anatomic distribution of pain, motor, sensory and reflex loss."

*See* 20 C.F.R. 404, Subpt. P, App. 1, Listing 1.04.  To establish the

17

additional requirements, Otts argues that the radiculopathy down her right arm and shoulder, combined with muscle weakness and limited range of motion in her cervical spine, taken together, satisfy the 1.04 listing.  (Tr. 239, 264, 272).

While it may be true that Otts had some limitations due to her neck impairment, the record does not support a finding of severity under listing 1.04.  As noted in the ALJ's decision, Otts was diagnosed by Dr. Kalyani Ganesh with a herniated neck disc in August of 2000.  (Tr. 30, 244-247).  However, Dr. Ganesh's overall prognosis was that Otts was stable, with no physical limitations for sitting or standing, and mild limitations walking, lifting, carrying, pushing and pulling.  (Tr. 247).  As the ALJ also noted, Otts' primary physician, Dr. Barber, observed "specific limitations of the right arm due to shoulder and neck pain and decreased range of motion, strength, and sensation in the right arm."  (Tr. 32). However, Dr. Barber did not make findings consistent with the requirements necessary for the ALJ to find a severe neck impairment.  Finally, Dr. Richard Zogby, an orthopedic surgeon who examined Otts in February 2001, did not observe any neck injury.  Upon examination, Dr. Zogby noted that her spinal exam was normal, other than the cervical spine.  He noted that her "cervical

18

spine reveals tenderness in the paraspinal muscles on the right." (Tr. 264).

He further noted:

> she has limited range of motion with 20 degrees of extension
> and 20 degrees of rotation, right [sic] with increased right arm
> pain and shoulder pain. She has 30 degrees of left rotation
> and 30 degrees of flexion. Motor examination: 5-/5, right upper
> extremity. All roots are normal on the left. Sensory is
> decreased in the right arm...[n]ormal on the left[.]...

*Id.* Based on these findings, Dr. Zogby assessed Otts with herniated

cervical discs and radiculopathy. *Id.*

Based on the objective medical evidence, the ALJ properly

concluded that Otts' impairment did not direct a finding of disability.

Accordingly, the ALJ's determination was based on substantial evidence

and must be affirmed.

**D.    Treating Physician Rule**

Otts argues that the ALJ did not give controlling weight to Dr.

Barber's opinion that her RFC fell below that required for sedentary work.

Generally, the opinion of a treating physician is given controlling weight if it

"is well-supported by medically acceptable clinical and laboratory

diagnostic techniques and is not inconsistent with the other substantial

evidence[.]" *Foxman v. Barnhart*, 157 Fed. Appx. 344, 346 (2d Cir. 2005)

(citing 20 C.F.R. § 404.1527(d)(2)); 20 C.F.R. § 416.927(d)(2).  An "ALJ

cannot arbitrarily substitute his own judgment for [a] competent medical

opinion."  *Rosa v. Callahan*, 168 F.3d 72, 79 (2d Cir. 1999) (internal

quotation marks and citation omitted).  If the treating physician's opinion is

not given "controlling weight," the ALJ must consider the entire record and

give special assessment to several factors to determine how much weight

to afford the opinion.  *See* 20 C.F.R. §§ 404.1527(d)(2); 416.927(d)(2).

The factors are: "the [l]ength of the treatment relationship and the

frequency of examination" by the treating physician for the condition(s) in

question, the medical evidence supporting the opinion, the consistency of

the opinion with the record as a whole, the qualifications of the treating

physician, and other factors tending to support or contradict the opinion.

20 C.F.R. §§ 404.1527(d)(2)-(6), 416.927(d)(2)-(6).

　　　Moreover, "the ultimate finding of whether a claimant is disabled and

cannot work...[is] reserved to the Commissioner."  *Snell v. Apfel*, 177 F.3d

128, 133 (2d Cir. 1999) (internal quotation marks and citation omitted).

"That means that the Social Security Administration considers the data that

physicians provide but draws its own conclusions as to whether those [sic]

data indicate disability."  *Id.*  Thus, "[a] treating physician's statement that

20

the claimant is disabled cannot itself be determinative." *Id.*  Furthermore,

where the evidence of record includes medical source opinions that are

inconsistent with other evidence or are internally inconsistent, the ALJ must

weigh all of the evidence and make a disability determination based on the

totality of that evidence.  *See* 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2).

Here, Otts contends that Dr. Barber determined that her RFC was

below that required to perform sedentary work.  This contention misstates

Dr. Barber's findings.  As the ALJ noted, Dr. Barber stated that "I would

consider her disabled from any kind of work that would require use of the

right arm in any way." (Tr. 32, 262).  Moreover, in assessing Otts' ability to

do work-related activities, Dr. Barber determined that she had no

limitations in standing, sitting, or walking.  (Tr. 271-72).  However, he

further determined that she could lift less than ten pounds and had postural

limitations due to her neck pain.  (Tr. 272).

Otts also claims that her inability to do sedentary work is supported

by Dr. Zogby's finding that she was totally disabled.  The ALJ properly

gave Dr. Zogby's finding of total disability less weight than Dr. Barber's

opinion, since Dr. Barber was her treating physician and examined her

over a longer period of time.  Accordingly, the ALJ's findings are supported

by substantial evidence.

## E.    Residual Functional Capacity

Otts argues that the ALJ incorrectly determined that she is capable of
"light exertional work."  She specifically objects to the ALJ's findings that
she can: (1) lift or carry 20 pounds occasionally; (2) frequently lift or carry
10 pounds; and (3) sit for up to 6-8 hours a day.  (Tr. 32).  The Regulations
define RFC as "the most [an individual] can still do despite [their]
limitations."  20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1).  At the review
level relevant here, the responsibility for determining a claimant's RFC
rests with the ALJ.  *See* 20 C.F.R. §§ 404.1546, 416.946.  An ALJ's RFC
assessment is a medical determination that must be based on probative
medical evidence of record.  *See Gray v. Chater*, 903 F. Supp. 293, 301
(N.D.N.Y. 1995).  An ALJ may not "substitute his own judgment for [a]
competent medical opinion."  *Rosa v. Callahan*, 168 F.3d 72, 79 (2d Cir.
1999); *Balsamo v. Chater*, 142 F.3d 75, 81 (2d Cir. 1998) (citation omitted).

Otts' contentions are without merit.  As the ALJ noted, Dr. Barber
stated that "I would consider her disabled from any kind of work that would
require use of the right arm in any way."  (Tr. 32, 262).  In assessing Otts'

22

ability to do work-related activities, Dr. Barber determined that she had no

limitations in standing, sitting, or walking.  *See id.*  While this evidence is

contradicted by Dr. Zogby's finding of total disability, Dr. Barber's opinion

coupled with the state agency medical consultants who determined that

Otts was capable of light work, constitute substantial evidence for the ALJ's

findings.  (Tr. 32, 254-261).  Accordingly, the ALJ's findings were

supported by substantial evidence.

**F.**   **<u>Vocational Expert Testimony</u>**

Otts claims that the vocational expert based his opinion on improper

findings, since the ALJ incorrectly determined Otts' RFC and failed to take

into account the opinion of her treating physician.  A vocational expert may

provide testimony regarding the existence of jobs in the national economy.

*See Dumas v. Schweiker,* 712 F.2d 1545, 1553-54 (2d Cir. 1983).  "The

vocational expert's testimony is only useful if it addresses whether the

particular claimant, with [her] limitations and capabilities, can realistically

perform a particular job."  *Jehn v. Barnhart*, 408 F. Supp. 2d 127, 135

(E.D.N.Y. 2006) (citation omitted).  "Proper use of vocational testimony

presupposes both an accurate assessment of the claimant's physical and

vocational capabilities, and a consistent use of that profile by the

vocational expert in determining which jobs the claimant may still perform."
*Lugo v. Chater*, 932 F. Supp. 497, 504 (S.D.N.Y. 1996).

Here, Otts argues that the hypothetical questions posed to the vocational expert, David Conroy, did not fully take into account the restrictions to her right arm.  This contention is without merit.  As the ALJ noted, Conroy concluded that Otts would be able to perform certain jobs that did not require extensive arm use.  (Tr. 150).  For example, Conroy found that a person with Otts' limitations would be capable of working as an information clerk or surveillance system monitor.  (Tr. 33, 151).

Otts further argues that Conroy's determination that a person with right arm limitations is capable of performing work as an information clerk contradicts Occupational Information Network (O*Net).[8]  This contention is also without merit.  O*Net is not considered a reliable authority for purposes of determining disability and was properly not considered by the ALJ.  *See* 20 C.F.R. §§ 404.1566(d)(1)-(5), 416.966(d)(1)-(5).  Moreover, the ALJ's reliance on Conroy's vocational testimony is proper because it is consistent with the medical evidence of record and the opinion of Otts'

---

[8]O*Net is a U.S. Department of Labor database that provides job listings based on skill sets.  *See* http://www.online.onetcenter.org.

treating physician.  Accordingly, the ALJ's findings based on the opinions of Mr. Conroy were supported by substantial evidence.

### G.  <u>Non-Exertional Limitations</u>

Otts argues that the ALJ did not properly consider her non-exertional limitations.  She specifically argues that the ALJ should have considered her limitations in stooping and reaching and her environmental limitations as significant non-exertional limitations.

The Grids take into account a claimant's RFC, age, education, and work experience.  *See* 20 C.F.R. 404, Subpt. P, App. 2; *see also Rosa*, 168 F.3d at 78.  "'Generally...if a claimant suffers only from exertional impairments, *e.g.,* strength limitations, then the Commissioner may satisfy his burden by resorting to the applicable grids.  For a claimant whose characteristics match the criteria of a particular grid rule, the rule directs a conclusion as to whether [s]he is disabled.'"  *Rosa*, 168 F.3d at 82 (citation omitted); *see also Pratts v. Chater*, 94 F.3d 34, 39 (2d Cir. 1996).

Whether the Grids apply is to be determined on a case-by-case basis.  *See id.* (citing *Bapp*, 802 F.2d at 605-06).  Sole reliance on the Grids is improper if a claimant suffers from both exertional and non-exertional impairments.  *See Rosa*, 168 F.3d at 82.  Where the claimant's

non-exertional impairments "significantly diminish" the range of work allowed by h[er] exertional impairments, the grids alone do not "provide the exclusive framework for making a disability determination." *Bapp*, 802 F.2d at 605. To "significantly diminish" the claimant's range of work, a non-exertional impairment must cause an "additional loss of work capacity beyond a negligible one or, in other words, one that so narrows a claimant's possible range of work as to deprive h[er] of a meaningful employment opportunity." *Id.*; *see Pratts*, 94 F.3d at 39.

Here, Otts contends that due to her non-exertional limitations, the ALJ should not have applied the Grids. However, the ALJ did not mechanically plug Otts' exertional limitations into a formulaic Grid. The ALJ cited Rule 202.21 in his decision as a "framework" for reaching his decision. (Tr. 33). The record shows that the ALJ considered other factors such as Otts' younger age (34 at the time she filed for benefits), as well as her education, work history, and physical functional capacity. *Id.* Thus, the Grids were not the sole means of analysis used by the ALJ. The record is clear that the ALJ based his decision on the opinion of her treating physician and the vocational expert's testimony that she could perform some work in the national economy. (Tr. 33). Accordingly, the ALJ's

findings were based on substantial evidence.

**H.    <u>Subjective Complaints of Pain</u>**

Otts contends that the ALJ erred in finding that "[her] statements concerning her difficulties and limitations are not entirely credible to the extent alleged." (Tr. 32). The Commissioner is obligated to evaluate all of a claimant's "symptoms, including pain, and the extent to which [those] symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence." 20 C.F.R. §§ 404.1529(a), 416.929(a). The ALJ must perform a two-step analysis. *See* 20 C.F.R. §§ 404.1529, 416.929; *see also Crouch v. Comm'r, Soc. Sec. Admin.*, 01-CV-899, 2003 WL 22145644, at *10 (N.D.N.Y. Sept. 11, 2003) (citation omitted). First, based upon the objective medical evidence, the ALJ must determine whether the impairments "could reasonably be expected to produce the pain[9] or other symptoms alleged[.]..." 20 C.F.R. §§ 404.1529(a), 416.929(a); *see Crouch*, 2003 WL 22145644, at *10. "Second, if the medical evidence alone establishes the existence of such

---

[9]The pain must be properly evaluated, considering the applicant's credibility and motivation as well as the medical evidence of impairment to reach an independent judgment concerning the true extent of the alleged pain, and the degree to which it hampers the applicant's ability to engage in substantial gainful employment. *See Lugo v. Chater*, 932 F. Supp. 497, 504 (S.D.N.Y. 1996).

impairments, then the ALJ need only evaluate the intensity, persistence, and limiting effects of a claimant's symptoms to determine the extent to which it limits the claimant's capacity to work." *Crouch*, 2003 WL 22145644, at *10 (citing 20 C.F.R. §§ 404.1529(c), 416.929(c)).

A plaintiff may suffer some degree of pain as a result of a condition. However, some pain does not automatically translate into disabling pain. *See Dumas*, 712 F.2d at 1552 ("disability requires more than mere inability to work without pain"). Moreover, "[a]n individual's statement as to pain or other symptoms shall not alone be conclusive evidence of disability[.]..." 42 U.S.C. § 423(d)(5)(A).

Where the alleged symptoms suggest that the impairment is greater than demonstrated by objective medical evidence, the ALJ will consider other factors. These factors include "daily activities;...the location, duration, frequency and intensity of [claimant's] pain or other symptoms;...[t]he type, dosage, effectiveness and side effects of...medication;" and other treatments or measures to relieve those symptoms. 20 C.F.R. §§ 404.1529(c)(3)(i)-(vii), 416.929(c)(3)(i)-(vii); Social Security Ruling (SSR) 96-7p. "The reasons for the credibility finding must be grounded in the evidence and articulated in the determination or

28

decision." SSR 96-7p. Therefore, "[a]n [ALJ] may properly reject [subjective complaints of pain] after weighing the objective medical evidence in the record, the claimant's demeanor, and other indicia of credibility, but must set forth his or her reasons with sufficient specificity to enable [the court] to decide whether the determination is supported by substantial evidence." *Lewis v. Apfel*, 62 F. Supp. 2d 648, 651 (N.D.N.Y. 1999) (internal quotation marks and citation omitted).

Here, Otts contends that the ALJ improperly discredited her subjective complaints of pain. However, as the ALJ noted, Otts' complaints were not supported by objective medical evidence. Notably, Otts did not seek surgery for her spine or comply with therapy recommendations to improve her pain and weakness symptoms. (Tr. 32). The ALJ also noted that Otts' daily activities belied her subjective complaints of pain. (Tr. 32). For example, Otts claims that she cannot do many of the things she used to do, including: (1) household chores, (2) lifting, (3) washing her hair, (4) sitting for long periods of time, (5) typing, and (6) filing. (Tr. 31, 135). Otts, however, also testified that she was still able to: (1) drive and (2) cook. *See id.* In consideration of the medical evidence, the vocational expert's opinion, and Otts' own testimony, the ALJ properly concluded that Otts'

pain was not disabling and that she was still capable of doing some work.

*See id.*  Accordingly, the ALJ's decision was supported by substantial

evidence and is therefore affirmed.

**ORDERED,** that the decision denying benefits is **AFFIRMED**; and it

is further

**ORDERED,** that the Clerk of the Court provide a copy of this Order

to the parties.

**IT IS SO ORDERED.**

September 15, 2006
Albany, New York

_____
United States District Court Judge